# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

## CRIMINAL COVER SHEET

*__Instructions:__ Effective November 1, 2016, this Criminal Cover Sheet must be completed and submitted, along with the Defendant Information Form, for each new criminal case.*

**CASE NAME:**

USA V.  Baba Nadimpalli

**CASE NUMBER:**  CR24-00021 CRB

CR

| | | |
|---|---|---|
| **Is This Case Under Seal?** | Yes ✔ | No |
| **Total Number of Defendants:** | 1 ✔   2-7 | 8 or more |
| **Does this case involve ONLY charges under 8 U.S.C. § 1325 and/or 1326?** | Yes | No ✔ |
| **Venue (Per Crim. L.R. 18-1):** | SF ✔   OAK | SJ |
| **Is this a potential high-cost case?** | Yes | No ✔ |
| **Is any defendant charged with a death-penalty-eligible crime?** | Yes | No ✔ |
| **Is this a RICO Act gang case?** | Yes | No ✔ |

**Assigned AUSA (Lead Attorney):**  Noah Stern

**Date Submitted:**  1/17/2024

**Comments:**

RESET FORM          SAVE PDF

Form CAND-CRIM-COVER (Rev. 11/16)

# United States District Court

## FOR THE
### NORTHERN DISTRICT OF CALIFORNIA

## VENUE: SAN FRANCISCO

**FILED**

Jan 17 2024

Mark B. Busby
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

UNITED STATES OF AMERICA,

V.

CR24-00021 CRB

BABA NADIMPALLI

DEFENDANT(S).

# INDICTMENT

15 U.S.C. §§ 78j(b) and 78ff and 17 C.F.R. § 240.10b-5 – Securities Fraud;
18 U.S.C. § 1343 – Wire Fraud;
18 U.S.C. § 2 – Aiding and Abetting;
18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c); 18 U.S.C. § 982(a)(1) –
Forfeiture Allegation

A true bill.

/s/ Foreperson of the Grand Jury

Foreman

Filed in open court this 17th day of

January 2024 .

Brittany Sims, Clerk

Bail, $ No Bail

Hon. Lisa J. Cisneros, U.S. Magistrate Judge

1  ISMAIL J. RAMSEY (CABN 189820)
   United States Attorney

2

3

4

5

```
┌─────────────────────────────────────┐
│             FILED                    │
│                                      │
│           Jan 17 2024                │
│                                      │
│          Mark B. Busby               │
│   CLERK, U.S. DISTRICT COURT         │
│  NORTHERN DISTRICT OF CALIFORNIA     │
│         SAN FRANCISCO                 │
└─────────────────────────────────────┘
```

6

7

8                    UNITED STATES DISTRICT COURT

9                  NORTHERN DISTRICT OF CALIFORNIA

10                     SAN FRANCISCO DIVISION

11  UNITED STATES OF AMERICA,              )  CASE NO.  CR24-00021 CRB
                                           )
12        Plaintiff,                       )  VIOLATIONS:
                                           )  15 U.S.C. §§ 78j(b) and 78ff and 17 C.F.R.
13     v.                                  )  § 240.10b-5 – Securities Fraud;
                                           )  18 U.S.C. § 1343 – Wire Fraud;
14  BABA NADIMPALLI                        )  18 U.S.C. § 2 – Aiding and Abetting;
                                           )  18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c); 18
15        Defendant.                       )  U.S.C. § 982(a)(1) – Forfeiture Allegation
                                           )
16                                         )  SAN FRANCISCO VENUE
                                           )
17                                         )
                                           )
18  _____   )

19

20                        I N D I C T M E N T

21  The Grand Jury charges:

22                      Introductory Allegations

23        At all times relevant to this Indictment:

24        1.    The defendant, Baba Nadimpalli ("NADIMPALLI"), resided in San Francisco,

25  California, in the Northern District of California.  In 2016, NADIMPALLI founded SKAEL, Inc.

26  ("SKAEL"), a company based in San Francisco, California, in the Northern District of California.  From

27  2016 until in or about July 2022, NADIMPALLI was SKAEL's Chief Executive Officer.

28  NADIMPALLI maintained a personal joint checking account in San Francisco, California at First

    INDICTMENT

1   Republic Bank ("FRB").

2       2.      SKAEL was a corporation organized under the laws of the State of Delaware with its

3   principal place of business in San Francisco, California.  SKAEL maintained corporate bank accounts in

4   Santa Clara, California at Silicon Valley Bank ("SVB") and in San Francisco, California at FRB.  When

5   SKAEL solicited and received financial investments from investors, the money was deposited in its

6   SVB or FRB accounts.

7       3.      The entity identified in this Indictment as "Investor 1," was an investment firm located in

8   San Francisco, California, in the Northern District of California.

9       4.      The entity identified in this Indictment as "Investor 2," was an investment firm based in

10  Texas.

11      5.      The entity identified in this Indictment as "Investor 3," was an investment firm with an

12  office in New York, New York.

SKAEL's Business

14      6.      SKAEL was a software-as-a-service ("Saas") company that provided its corporate clients

15  with artificial intelligence ("AI") and automation software to assist workers with mundane, time-

16  intensive tasks.  SKAEL offered customers what it called Digital Employees, which SKAEL stated

17  could connect databases, synthesize large amounts of information, provide information and insights, and

18  perform tasks.  SKAEL software engineers would build Digital Employees for customers to perform

19  tasks based on specifications agreed upon between SKAEL and the customer.  To do so, SKAEL would

20  connect a customer's applications, databases and documents to its platform and then build the Digital

21  Employees.

22      7.      SKAEL claimed that one Digital Employee could process five human employee's

23  workloads and that by engaging a Digital Employee, a customer could regain 2.5 hours per day per

24  employee, $100,000 per year per Digital Employee, and retain happier employees and customers.

25      8.      SKAEL charged customers implementation fees—for the building of Digital

26  Employees—and subscription fees—for the use of the Digital Employees once they were built.

27      9.      To fund its operations, SKAEL raised money from investors.  In or about January 2020,

28  SKAEL raised approximately $3 million in a Seed 1 preferred stock offering.  Between approximately

INDICTMENT                                      2

1  February 2021 and December 2021, SKAEL raised approximately $7.85 million from investors through

2  Simple Agreements for Future Equity ("SAFE"), a type of investment contract that gives investors a

3  right to later receive stock in the company.  In or around February 2022, SKAEL raised approximately

4  $30 million in a Series A preferred stock offering.  The pricing of the Series A preferred stock offering

5  valued SKAEL at approximately $230 million, post-money.  In total, SKAEL raised over $40 million.

6      10.     SKAEL used the software-as-a-service ("SaaS") revenue model, which is when an end

7  user licenses software on a subscription basis and revenue is recognized ratably over the period of the

8  subscription.  As with most SaaS businesses, annual recurring revenue, or "ARR," was an important

9  metric for SKAEL investors.  ARR is a measure of the total revenue expected per year from committed

10  customers with signed contracts.  The goal of the metric is to give investors insight into a company's

11  future revenue performance based on its current subscriptions.

12      11.     NADIMPALLI had full visibility into and responsibility over SKAEL's operations and

13  sales.  NADIMPALLI controlled and was aware of the company's financial information, including

14  financial figures, and sales and customer information.  NADIMPALLI had sole and exclusive control

15  over and access to SKAEL's SVB account, and was a signatory and had access to SKAEL's FRB

16  account.

The Scheme to Defraud Investors

18      12.     From a time unknown but no later than in or about January 2020 and through in or about

19  February 2022, NADIMPALLI engaged in a scheme, plan, and artifice to defraud SKAEL investors as

20  to a material matter, and obtain money and property by means of materially false and fraudulent

21  pretenses, representations, and promises, by making materially false and misleading statements, and

22  failing to disclose material facts with a duty to disclose.

23      13.     Beginning in or about January 2020, NADIMPALLI knowingly and intentionally made

24  materially false and misleading statements to investors and failed to disclose material facts, using the

25  following manner and means, among others: (1) causing SKAEL to record revenue in its accounting

26  records and include in the company's ARR tabulations amounts from purported customers that had not

27  agreed to purchase SKAEL's software and services, (2) falsely inflating SKAEL's revenue and ARR

28  from real SKAEL customers, (3) creating false bank transaction records and sending those records to

INDICTMENT                                3

1   SKAEL's finance staff to inflate revenue and ARR, (4) communicating false financial and sales

2   information to investors, (5) sending falsified bank statements to at least one investor; and (5)

3   communicating materially false information about SKAEL's customers to investors.

4        14.    Beginning no later than in or about January 2020, NADIMPALLI knowingly and

5   intentionally provided false and inflated ARR information to Investor 1 and falsely told Investor 1 that

6   certain entities subscribed to and used SKAEL's software.  For example, NADIMPALLI told Investor 1

7   that SKAEL's ARR had grown to $1 million when, in fact, it was much lower.  NADIMPALLI also told

8   Investor 1 that SKAEL had $150,000 ARR contracts with multiple companies, but in fact those

9   companies were not SKAEL customers or did not have current contracts to pay SKAEL subscription

10  revenue.

11       15.    Throughout 2020, NADIMPALLI continued to provide materially false information to

12  Investor 1 about SKAEL's ARR and customers.

13       16.    In or around 2020, NADIMPALLI began maintaining a spreadsheet purporting to track

14  SKAEL's ARR, including customer-level ARR.  NADIMPALLI had full control of and responsibility

15  for the substantive information in the spreadsheet.  NADIMPALLI falsified the spreadsheet by

16  (1) indicating that SKAEL was receiving ARR from certain companies that did not subscribe to

17  SKAEL's software and services, (2) overstating ARR from certain customers who were SKAEL

18  customers at lower dollar amounts than was represented in the spreadsheet, and (3) leaving customers

19  (and corresponding ARR) in the spreadsheet after those customers had terminated their SKAEL

20  subscription.

21       17.    In or around 2021, NADIMPALLI provided materially false information about SKAEL's

22  ARR, revenue, and customers to investors in advance of their investments in SKAEL through SAFEs.

23  The information was material to investors' decisions to purchase SAFEs.

24       18.    In or about January 2021, Investor 1 requested SKAEL's bank statements from

25  NADIMPALLI for purposes of validating NADIMPALLI's ARR representations in the ARR tracking

26  spreadsheet.  NADIMPALLI subsequently emailed Investor 1 documents purporting to be bank

27  statements from SKAEL's SVB account for March, May, August, September, November, and December

28  of 2020.  In fact, NADIMPALLI falsified and altered the statements, or knew that the statements were

INDICTMENT                                    4

1  falsified and altered, to include purported customer payments that had not actually been deposited or

2  made into the account, among other falsifications.

3      19.    In or around June 2021, SKAEL hired a director of finance.  NADIMPALLI directed the

4  finance director to create financial statements for SKAEL in advance of SKAEL's Series A preferred

5  stock offering.  Although the finance director requested direct access to SKAEL's SVB account,

6  NADIMPALLI did not provide access and instead provided a spreadsheet of transactions to the finance

7  director.  NADIMPALLI falsely represented to the finance director that the spreadsheet contained a

8  download of the SVB account transaction detail.  However, NADIMPALLI falsified the bank

9  transaction detail before providing it to the finance director, including by making false entries for the

10  purported receipt of customer funds.  NADIMPALLI also provided the finance director the ARR

11  spreadsheet that he maintained.  The finance director used the false information NADIMPALLI

12  provided to generate financial statements, including a profit and loss statement that contained false and

13  inflated revenue information.

14      20.    In connection with SAFE offerings as well as the preparation for SKAEL's Series A

15  offering, in or around July 2021, NADIMPALLI published a video to potential investors in which he

16  spoke about SKAEL's customers and ARR.  In the video, NADIMPALLI provided false information

17  about SKAEL's ARR and customer adoption of SKAEL's products, including representing that

18  (1) SKAEL had generated $2.3 million of ARR by the end of 2020, (2) SKAEL's current ARR was

19  more than $6 million, and (3) ARR would be more than of $7 million by the end of 2021.

20      21.    In connection with the Series A Preferred Stock Offering, NADIMPALLI directed the

21  creation of an electronic data room through which potential investors could access information about

22  SKAEL.  NADIMPALLI caused documents containing materially false information about SKAEL to be

23  placed in the data room, knowing that investors would review and rely on the documents, including but

24  not limited to the following materials and information:

25      a.    The ARR spreadsheet that NADIMPALLI maintained (with customer names

26           redacted) that contained materially false information about SKAEL's ARR and

27           customers.  The spreadsheet represented that SKAEL's ARR at the end of

28           November 2021 was approximately $6,306,000 when in fact SKAEL's actual

INDICTMENT                           5

ARR at this time was well under $1 million.

    b.   A profit and loss statement showing quarterly financial results and projections that contained materially false information about SKAEL's subscription revenue. The spreadsheet represented that SKAEL received approximately $4,531,079 in subscription revenue in 2021 despite that fact that SKAEL's actual revenue during that period was less than a quarter of that amount.

    c.   A financial metrics spreadsheet that contained materially false subscription revenue and ARR amounts.

    d.   An investor presentation that contained materially false information about SKAEL's ARR, revenue, and customer adoption. The investor deck stated that SKAEL had $2.3 million in ARR at the end of 2020, and $7 million in ARR at the end of 2021, when, in fact, SKAEL's ARR was significantly less than that as of each of those dates. The investor deck falsely stated that SKAEL had zero customer churn. The investor deck also included logos of companies suggesting and representing that they were customers, when in fact those companies were not SKAEL customers.

22.    NADIMPALLI also provided the false information described above and similar false information to potential Series A investors orally and via email or other written messages in advance of their investments in SKAEL. This included, with respect to some potential investors, a version of the ARR spreadsheet that NADIMPALLI maintained that was unredacted and identified certain purported customers. The false information in the spreadsheet included:

    a.   The representation that ARR from an entity referred to herein as Customer 1 was $1,020,000 as of the end of November 2021, when in fact Customer 1's contract with SKAEL in 2021 was for only $100,000 for digital employee implementation.

    b.   The representation that ARR from an entity referred to herein as Customer 2 was $600,000 as of the end of November 2021, when in fact Customer 2's contract with SKAEL was for approximately $50,000 per year.

    c.   The representation that ARR from an entity referred to herein as Non-Customer 1

INDICTMENT                                  6

was $186,000 as of the end of November 2021, when in fact Non-Customer 1 was

not a SKAEL customer.

    d.   The representation that ARR from an entity referred to herein as Non-Customer 2

was $156,000 as of the end of November 2021, when in fact Non-Customer 2 was

not a SKAEL customer.

    e.   The representation that ARR from an entity referred to herein as Former

Customer 1 was $126,000 as of the end of November 2021, when in fact

SKAEL's relationship with Former Customer 1 (through a reseller) ended in early

2020.

23.     After receiving false and misleading statements, misrepresentations, and omissions from NADIMPALLI and SKAEL, Investors 1, 2, and 3 initiated electronic wire transfers for the purpose of investing money in SKAEL. These wires, specifically alleged below, used a domestic electronic funds transfer system known as the Fedwire system, which is owned and operated by the United States Federal Reserve System. All Fedwire wire transfers were electronically routed through Fedwire centers outside of California and into SKAEL's bank accounts in the Northern District of California. All of the wire transfers alleged in this Indictment travelled between one state and another state.

24.     The SAFEs purchased by SKAEL's investors were investment contracts and constitute securities under the provisions of Title 15, United States Code, Section 78j(b) and Title 17, Code of Federal Regulations, Section 240.10b-5.

25.     Investors in SKAEL's Seed 1 and Series A preferred stock offerings were issued shares of SKAEL stock, and those shares of SKAEL constitute securities under the provisions of Title 15, United States Code, Section 78j(b) and Title 17, Code of Federal Regulations, Section 240.10b-5. NADIMPALLI's misrepresentations alleged were in connection with the purchase and sale of SKAEL shares and SAFEs.

The Scheme to Defraud SKAEL

26.     From no later than in or about January 2020 to approximately July 2022, NADIMPALLI engaged in a scheme, plan, and artifice to defraud SKAEL as to a material matter, and to obtain money and property, by means of materially false and fraudulent pretenses, representations, and promises, by

INDICTMENT                 7

making materially false and misleading statements, and failing to disclose material facts with a duty to disclose.

27.     The objective of the scheme to defraud was to deprive SKAEL of money and divert it for NADIMPALLI's own personal use.

28.     As the CEO of SKAEL, NADIMPALLI owed fiduciary duties of care and loyalty to SKAEL and its shareholders, and NADIMPALLI had a duty to disclose to the board and the shareholders each of the actions resulting in the diversion and misappropriation of SKAEL funds.

29.     NADIMPALLI used his sole and exclusive control over SKAEL's SVB account to use SKAEL's funds, including capital received from investors during the securities offerings discussed above, for personal purposes without authorization.  NADIMPALLI used the company funds in the SVB account to pay the mortgage for his home in San Francisco, to pay his personal property tax, to pay contractors for work performed on his home, to pay his personal credit cards, including credit cards in his wife's name, and to pay car payments, among other personal expenses.  NADIMPALLI concealed and did not disclose his use of SKAEL company funds for personal purposes from the board of directors and investors.  In all, NADIMPALLI embezzled and misappropriated over $500,000 from SKAEL.

30.     On a nearly monthly basis, NADIMPALLI directed SVB to wire $4,700 to a joint checking account he held with his wife at FRB.  These wires used the Fedwire system and, therefore, were electronically routed through Fedwire centers outside of California and into NADIMPALLI's joint checking account in the Northern District of California.  NADIMPALLI then paid his FRB mortgage with the funds.

31.     In approximately April 2022, NADIMPALLI wired approximately $6,705,000 in two wires from SKAEL'S SVB account to SKAEL's FRB account.  NADIMPALLI told SKAEL's finance director that this completed the transfer of funds from the SVB account to the FRB account and that NADIMPALLI would close the SVB account.  NADIMPALLI concealed from the finance director—as well as SKAEL's board and shareholders—that after the wires, approximately $100,732 remained in SKAEL's SVB account.  NADIMPALLI continued secretly using these funds for personal purposes, including paying personal credit cards in his and his wife's names and wiring $4,700 to his personal joint checking account for payment of his mortgage in or about June and July 2022.

INDICTMENT                                8

32.    NADIMPALLI's concealment and failure to disclose his personal use and misappropriation of SKAEL's funds under the control of SVB was material to SKAEL's board of directors and investors, and SKAEL's board and investors would have taken corrective action had the personal use of funds been disclosed.

COUNTS ONE THROUGH THREE:                    (15 U.S.C. § 78j(b) and 78ff;
                                                                        17 C.F.R. § 240.10b-5 – Securities Fraud)

33.    Paragraphs 1 through 32 of this Indictment are re-alleged and incorporated as if fully set forth here.

34.    Beginning at an unknown date, but no later than in or about January 2020, and continuing to in or about February 2022, both dates being approximate and inclusive, in the Northern District of California and elsewhere, the defendant,

BABA NADIMPALLI,

willfully and knowingly, directly and indirectly, by the use of means and instrumentalities of interstate commerce, and of the mails, and of facilities of national securities exchanges, in connection with the purchase and sale of securities, used and employed manipulative and deceptive devices and contrivances by (a) employing devices, schemes, and artifices to defraud; (b) making untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon persons, specifically, the use of the above devices, schemes and artifices to defraud, false statements and omissions of material facts, and acts of fraud and deceit in connection with the following securities offerings to investors conducted during the following approximate time periods, each offering being a separate count:

| COUNT | DATE | OFFERING |
|-------|------|----------|
| 1 | January 2020 | Seed 1 Preferred Stock Offering |
| 2 | February 2021 to December 2021 | SAFEs issued to Investor 1 and others |
| 3 | February 2022 | Series A Preferred Stock Offering |

All in violation of Title 15, United States Code, Sections 78j(b) and 78ff; and Title 17, Code of

INDICTMENT                    9

Federal Regulations, Section 240.10b-5.

COUNTS FOUR THROUGH EIGHT: (18 U.S.C. §§ 1343 and 2 – Wire Fraud, Aiding and Abetting)

35.    Paragraphs 1 through 34 of this Indictment are re-alleged and incorporated as if fully set forth here.

36.    From a time unknown but no later than in or about January 2020 through in or about February 2022, within the Northern District of California and elsewhere, the defendant,

BABA NADIMPALLI,

knowingly and with the intent to defraud participated in, devised, and intended to devise a scheme and artifice to defraud as to a material matter, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and by means of omission and concealment of material facts, and for the purpose of executing the aforementioned scheme and artifice to defraud, did knowingly transmit and cause to be transmitted in interstate and foreign commerce, by means of wire communications, certain writings, signs, signals, pictures, and sounds, that is electronic funds transfers and payments, or stock purchase orders transmitted in interstate commerce, as set forth below, each transaction being a separate count:

| COUNT | DATE | AMOUNT | WIRE TRANSMISSION |
|---|---|---|---|
| 4 | 1/29/2020 | $1,749,999.88 | Wire transfer from Investor 1's FRB account to SKAEL's SVB account |
| 5 | 2/2/2021 | $1,000,000 | Wire transfer from Investor 1's FRB account to SKAEL's SVB account |
| 6 | 12/16/2021 | $1,000,000 | Wire transfer from Investor 2's JP Morgan Chase account to SKAEL's SVB account |
| 7 | 2/1/2022 | $6,999,999.05 | Wire transfer from Investor 2's JP Morgan Chase account to SKAEL's SVB account |
| 8 | 2/7/2022 | $15,749,992.82 | Wire transfer from Investor 3's Barclays Bank account to SKAEL's FRB account |

All in violation of Title 18, United States Code, Sections 1343 and 2.

COUNTS NINE AND TEN:  (18 U.S.C. §§ 1343 & 2– Wire Fraud, Aiding and Abetting)

37.    Paragraphs 1 through 36 of this Indictment are re-alleged and incorporated as if fully set forth here.

38.    Beginning in or about January 2020, and continuing through in or about July 2022, in the

INDICTMENT                                        10

1  Northern District of California and elsewhere, the defendant,

2  BABA NADIMPALLI,

3  knowingly and with the intent to defraud participated in, devised, and intended to devise a scheme and

4  artifice to defraud as to a material matter, and to obtain money and property by means of materially false

5  and fraudulent pretenses, representations, and promises, and by means of omission and concealment of

6  material facts, and for the purpose of executing the aforementioned scheme and artifice to defraud, did

7  knowingly transmit and cause to be transmitted in interstate and foreign commerce, by means of wire

8  communications, certain writings, signs, signals, pictures, and sounds, that is electronic funds transfers

9  and payments, or stock purchase orders transmitted in interstate commerce, as set forth below, each

10 transaction being a separate count:

| COUNT | DATE | AMOUNT | WIRE TRANSMISSION |
|---|---|---|---|
| 9 | 6/10/2022 | $4,700 | Wire transfer from SKAEL's SVB account to NADIMPALLI's joint checking account at FRB |
| 10 | 7/6/2022 | $4,700 | Wire transfer from SKAEL's SVB account to NADIMPALLI's joint checking account at FRB |

15 All in violation of Title 18, United States Code, Sections 1343 and 2.

16 FORFEITURE ALLEGATION:        (18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c); 18 U.S.C. §
17                                982(a)(1))

18     39.    The allegations contained in this Indictment are re-alleged and incorporated by reference

19 for the purpose of alleging forfeiture pursuant to Title 18, United States Code, Section 981(a)(1)(C) and

20 Title 28, United States Code, Section 2461(c).

21     40.    Upon conviction for any of Counts One through Ten as set forth in this Indictment, the

22 defendant,

23  BABA NADIMPALLI,

24 shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and

25 Title 28, United States Code, Section 2461(c), all property, real or personal, constituting, or derived

26 from proceeds the defendant obtained directly and indirectly, as the result of those violations, including,

27 but not limited to, a forfeiture money judgment.

28     If any of the property described above, as a result of any act or omission of the defendant:

INDICTMENT                              11

1          a.      cannot be located upon exercise of due diligence;

2          b.      has been transferred or sold to, or deposited with, a third party;

3          c.      has been placed beyond the jurisdiction of the court;

4          d.      has been substantially diminished in value; or

5          e.      has been commingled with other property which cannot be divided without

6                  difficulty,

7    the United States of America shall be entitled to forfeiture of substitute property pursuant to Title 21,

8    United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c).

9          All pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States

10   Code, Section 2461(c); Title 18, United States Code, Section 982(a)(1); and Federal Rule of Criminal

11   Procedure 32.2.

12   DATED:        January 17, 2024                          A TRUE BILL.

13

14                                                      _____/s/_____
                                                        FOREPERSON

15

16   ISMAIL J. RAMSEY
     United States Attorney

17

18   /s/ Noah Stern_____
     NOAH STERN

19   ILHAM HOSSEINI
     Assistant United States Attorneys

20

21

22

23

24

25

26

27

28

INDICTMENT                                    12

AO 257 (Rev. 6/78)

---

## DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT

BY: ☐ COMPLAINT    ☐ INFORMATION    ☒ INDICTMENT
☐ SUPERSEDING

**OFFENSE CHARGED**

15 U.S.C. §§ 78j(b) and 78ff and 17 C.F.R. § 240.10b-5 –
Securities Fraud;
18 U.S.C. § 1343 – Wire Fraud;
18 U.S.C. § 981(a)(1)(C) and 28 U.S.C. § 2461(c); 18 U.S.C. §
982(a)(1) – Forfeiture Allegation

☐ Petty
☐ Minor
☐ Misde-meanor
☒ Felony

PENALTY:  Counts 1-3: 20 years imprisonment; 3 years supervised release;
$5,000,000 fine or 2x gain/loss, $100 special assessment, forfeiture
Counts 4-10: 20 years imprisonment, 3 years supervised release,
$250,000 fine or 2x gain/loss, $100 special assessment, forfeiture

Name of District Court, and/or Judge/Magistrate Location
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

**DEFENDANT - U.S**

▶ Baba Nadimpalli

DISTRICT COURT NUMBER

CR24-00021 CRB

**PROCEEDING**

Name of Complaintant Agency, or Person (& Title, if any)

Federal Bureau of Investigation

☐ person is awaiting trial in another Federal or State Court, give name of court

☐ this person/proceeding is transferred from another district per (circle one) FRCrp 20, 21, or 40.  Show District

☐ this is a reprosecution of charges previously dismissed which were dismissed on motion of:
☐ U.S. ATTORNEY    ☐ DEFENSE
} SHOW DOCKET NO.

☐ this prosecution relates to a pending case involving this same defendant
☐ prior proceedings or appearance(s) before U.S. Magistrate regarding this defendant were recorded under
} MAGISTRATE CASE NO.

Name and Office of Person Furnishing Information on this form _____ Ismail J. Ramsey
☒ U.S. Attorney   ☐ Other U.S. Agency

Name of Assistant U.S. Attorney (if assigned) _____ Noah Stern

**DEFENDANT**

**IS *NOT* IN CUSTODY**
Has not been arrested, pending outcome this proceeding.
1) ☒ If not detained give date any prior summons was served on above charges ▶ _____

2) ☐ Is a Fugitive

3) ☐ Is on Bail or Release from (show District)

**IS IN CUSTODY**
4) ☐ On this charge

5) ☐ On another conviction  } ☐ Federal ☐ State

6) ☐ Awaiting trial on other charges
If answer to (6) is "Yes", show name of institution

Has detainer been filed?  ☐ Yes  ☐ No  } If "Yes" give date filed

DATE OF ARREST ▶ Month/Day/Year

Or... if Arresting Agency & Warrant were not

DATE TRANSFERRED TO U.S. CUSTODY ▶ Month/Day/Year

☐ This report amends AO 257 previously submitted

---

**ADDITIONAL INFORMATION OR COMMENTS**

PROCESS:
☐ SUMMONS   ☐ NO PROCESS*   ☒ WARRANT    Bail Amount: No Bail

If Summons, complete following:
☐ Arraignment   ☐ Initial Appearance
Defendant Address:

\* Where defendant previously apprehended on complaint, no new summons or warrant needed, since Magistrate has scheduled arraignment

Date/Time: _____   Before Judge: _____

Comments: