CRAIG H. MISSAKIAN (CABN 125202)
United States Attorney

MARTHA BOERSCH (CABN 126569)
Chief, Criminal Division

NOAH STERN (CABN 297476)
Assistant United States Attorney

    450 Golden Gate Avenue, Box 36055
    San Francisco, California 94102-3495
    Telephone: (415) 436-6758
    FAX: (415) 436-7234
    Noah.Stern@usdoj.gov

Attorneys for United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. CR 24-00021 CRB |
| Plaintiff, | |
| v. | UNITES STATES' SENTENCING MEMORANDUM |
| BABA NADIMPALLI, | |
| Defendant. | |

## I. INTRODUCTION

Baba Nadimpalli lied about the success of his artificial intelligence startup, SKAEL, to convince venture capital firms, angel investors, and friends and employees to invest over $40 million in his company. To do so, he doctored bank statements and other documents to make it appear that SKAEL had subscriptions adding up to $7 million in annual recurring revenue ("ARR") when, in reality, SKAEL's ARR was less than $200,000. Nadimpalli also used over $500,000 in corporate funds for personal expenses. Nadimpalli's conduct caused significant harm to SKAEL's investors and employees and contributed to an unequal playing field in Silicon Valley's capital markets.

After Nadimpalli's crimes were fully exposed, he accepted responsibility for his conduct. He agreed to pay back the amounts he had taken from SKAEL, as well as the costs of the internal investigation into his conduct. He signed over his house to SKAEL so that the house could be sold and the proceeds used to pay back investors. Upon learning of the charges, Nadimpalli, who is an Australian citizen and had returned to live in Australia, immediately offered to voluntarily return to the United States to face the charges and to plead guilty, obviating the need for lengthy and costly extradition proceedings.

The Court should balance the seriousness of Nadimpalli's conduct here with his clear and early acceptance of responsibility. The government recommends that the Court sentence Nadimpalli to 18 months in prison (a variance below the applicable guidelines range), a three-year term of supervised release (with the terms recommended by Probation), a $200 special assessment, and restitution in the amount of $19,644,200.38. An 18-month sentence is a just punishment that is necessary to reflect the seriousness of the offense, provide for adequate general deterrence, and avoid unwarranted sentencing disparities.

## II. BACKGROUND

### A. Overview of the Fraud Scheme

Nadimpalli perpetrated a scheme to defraud investors by tricking them into believing that SKAEL was a successful artificial intelligence company with significant sales, revenue, and annual

recurring revenue.[1]  In reality, SKAEL had almost no success in convincing customers to subscribe to its software services, had minimal revenue, and almost no annual recurring revenue.

Nadimpalli founded SKAEL in 2016 and served as its Chief Executive Officer.  SKAEL advertised itself as a software-as-a-service company with the goal of providing its corporate clients with artificial intelligence and automation software to assist workers with mundane, time-intensive tasks through what SKAEL called Digital Employees.  SKAEL charged customers implementation fees—for the building of Digital Employees—and subscription fees—for the use of the Digital Employees once they were built.  To fund SKAEL's operations, Nadimpalli solicited investments from venture capital firms and other investors, including individuals.  Between January 2020 and February 2022, Nadimpalli raised over $40 million from these investors.

Nadimpalli convinced investors to provide this money by substantially inflating the success of SKAEL's artificial intelligence software.  Starting no later than January 2020, Nadimpalli began providing potential investors materially false information about SKAEL's revenue, ARR, and sales.  For example, in January 2020, knowing that ARR was a particularly important metric for potential investors, Nadimpalli told representatives of the venture capital firm referred to in the Indictment as Investor 1 that SKAEL's ARR was over $1 million and that multiple companies had subscribed to SKAEL's software through contracts worth $150,000 each in ARR.  Nadimpalli made these representations despite knowing that SKAEL's ARR was significantly lower and the companies he claimed had $150,000 ARR contracts were either not SKAEL customers or did not have current contracts to pay SKAEL subscription revenue.  In January 2020, investors paid SKAEL $3 million for Seed 1 Preferred Stock.

Nadimpalli also used a spreadsheet containing false ARR information on a customer level to perpetrate the fraud.  Nadimpalli inputted false information into this spreadsheet by (1) indicating that SKAEL was receiving ARR from certain companies that did not subscribe to SKAEL's software and services, (2) overstating ARR from certain customers who were SKAEL customers at lower dollar amounts than was represented in the spreadsheet, and (3) leaving customers (and corresponding ARR) in

---

[1] This statement of facts is based on the plea agreement, the Presentence Investigation Report, and other facts learned during the investigation that the government does not anticipate are materially in dispute.

the spreadsheet after those customers had terminated their SKAEL subscription. Nadimpalli provided this ARR spreadsheet, which he knew materially overstated SKAEL's ARR to potential investors and investors in advance of their investments in SKAEL.

In approximately January 2021, Investor 1 requested SKAEL's bank statements so that it could validate the ARR numbers in Nadimpalli's ARR spreadsheet. Before providing the bank statements to Investor 1, Nadimpalli manually altered the statements to include transactions that did not exist, including so that the bank statements reflected purported customer payments that were not real.

In approximately June 2021, Nadimpalli directed a finance employee to prepare financial statements that could be provided to potential investors in connection with a Series A offering. Nadimpalli provided the finance employee information and data to use in preparing the financial statements. Specifically, Nadimpalli provided the finance employee his ARR spreadsheet and also bank transaction data that was altered to include purported deposits from customers that did not exist. The finance employee did not have access to the bank account and relied on the falsified information Nadimpalli provided him.

In approximately July 2021, Nadimpalli told potential investors and investors that SKAEL's current ARR was more than $6 million when he knew that it was significantly lower than that, and was less than $1 million. Relying on this false information, between February 2021 and December 2021, investors paid SKAEL $7.85 million in connection with Simple Agreements for Future Equity ("SAFE"), a type of investment contract that gives investors a right to later receive stock in the company.

In February 2022, investors paid SKAEL approximately $30 million for Series A Preferred Stock, which valued the company at approximately $230 million after the closing of the transaction. In advance of the Series A offering, Nadimpalli knowingly caused false information to be uploaded to a data room for potential investors to perform diligence in advance of their transaction, including his ARR spreadsheet, the financial statements created by the finance employee, and an investor presentation that contained false information regarding SKAEL's ARR and customers. These materials represented that SKAEL's ARR had grown to $7 million when, in reality, SKAEL's ARR was less than $200,000.

Nadimpalli knowingly placed this false information in the data room to induce Series A investments. In total, over 40 funds and individuals invested in SKAEL from 2020 to 2022.

Nadimpalli's fraud collapsed when SKAEL's two finance employees worked to calculate SKAEL's financial information in advance of a board meeting (using the false bank information Nadimpalli had provided them) and calculated SKAEL's ARR to be only $4 million.[2] When confronted with this, Nadimpalli initially asked one of the finance employees to find a way to have the calculation add up to $7 million, the figure he had communicated to investors. The finance employee refused and Nadimpalli presented the $4 million ARR figure to the board, which led to an internal investigation into SKAEL's financials. During the investigation, Nadimpalli provided PDF bank statements to the investigators that he had altered to include customer deposits that did not exist. The forensic accounting firm ultimately obtained the bank statements directly from the bank, and using this information and other SKAEL documents calculated that SKAEL's actual ARR at the end of 2021 was less than $200,000.

In addition, from approximately January 2020 to July 2022, Nadimpalli used his exclusive control of one of SKAEL's bank accounts to use SKAEL's funds for personal purposes. For example, Nadimpalli he used the funds in the account to pay his mortgage and personal credit cards, among other personal expenses. In total, Nadimpalli misappropriated over $500,000 in SKAEL company funds for personal use. After Nadimpalli's conduct was discovered he entered an agreement to pay back this amount and other amounts and agreed to sign over his home to the company (which had been partially paid for personally and partially paid for with company funds through mortgage payments). When the sale was completed, SKAEL received $676,960.54 in proceeds

**B.    Nadimpalli is Charged and Voluntarily Returns to the United States**

On January 17, 2024, a federal grand jury returned an undersalt Indictment charging Nadimpalli with three counts of securities fraud, in violation of 15 U.S.C. §§ 78j(b), 78ff and 17 C.F.R. § 240.10b-5, and seven counts of wire fraud, in violation of 18 U.S.C. § 1343. On September 24, 2024, on the government's application, the case was unsealed. The government notified Nadimpalli's prior counsel

---

[2] In reality, it was less than $200,000.

of the Indictment prior to the case being unsealed and Nadimpalli's counsel immediately expressed Nadimpalli's interest in voluntarily returning to the United States and accepting responsibility. Subsequently, a plea agreement was negotiated and arrangements were made for Nadimpalli to travel to the United States to appear and plead guilty. On June 25, 2025, Nadimpalli appeared in the case and pleaded guilty pursuant to a plea agreement. Dkt. No. 8. Nadimpalli was allowed to remain out of custody on a bond and returned to Australia after the hearing. Nadimpalli is scheduled to return to the United States for the sentencing hearing which is scheduled for November 7, 2025.

### III.  SENTENCING GUIDELINES CALCULATIONS

The Sentencing Guidelines calculation for Nadimpalli's offenses is set forth in the plea agreement and the PSR and the Court should adopt it:

| | | |
|---|---|---:|
| a. | Base Offense Level, U.S.S.G. §2B1.1 (a): | 7 |
| b. | Specific Offense Characteristics, U.S.S.G. §2B1.1 (b)(1)(L):<br>(loss more than $25 million but less than $65 million) | +22 |
| c. | Specific Offense Characteristics, U.S.S.G. §2B1.1 (b)(2)(A)(i):<br>(more than 10 victims) | +2 |
| d. | Acceptance of Responsibility, U.S.S.G. §3E1.1(a) and (b): | - 3 |
| e. | Adjustment for Certain Zero-Point Offenders, §4C1.1 | -2 |
| f. | Total Offense Level: | 26 |

See PSR ¶¶ 33-43; Dkt. No. 8 ¶ 7.

The Probation Officer concluded that Nadimpalli has no criminal history and, therefore, falls into Criminal History Category I. PSR ¶ 47. As reflected in the PSR, the Guidelines range associated with adjusted offense level 26 and Criminal History Category I is 63 to 78 months prison. *Id.* ¶ 72.

### IV.  SENTENCING RECOMMENDATION

#### A.  Legal Standard

The Court should impose a sentence sufficient to "reflect the seriousness of the offense, promote respect for the law, and provide just punishment; to afford adequate deterrence; to protect the public; and to provide the defendant with needed education or vocational training, medical care, or other correctional treatment." *United States v. Ressam*, 679 F.3d 1069, 1088-89 (9th Cir. 2012) (en banc) (citations omitted); 18 U.S.C. § 3553(a). The United States Sentencing Guidelines serve as "the starting

point and initial benchmark" must be considered throughout the sentencing process. *See United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008); *see also United States v. Kimbrough*, 522 U.S. 85, 108 (2007). For a sentence outside of the Guidelines range the Court must ensure that the "justification is sufficiently compelling to support the degree of the variance." *Ressam* at 1089 (internal quotation omitted). "[A] major departure should be supported by a more significant justification than a minor one." *Gall v. United States*, 552 U.S. 38, 50 (2007).

### B. The Government's Recommended Sentence of 18 Months is Sufficient but Not Greater than Necessary in Light of the Section 3553(a) Factors

The government recommends that the Court sentence Nadimpalli to 18 months prison. This sentence is sufficient but not greater than necessary and appropriately balances the seriousness of Nadimpalli's offenses and the harm caused to victims with Nadimpalli's significant efforts to truly accept responsibility.

Nadimpalli accepted responsibility as early as possible in this case and has expressed what appears to be true remorse. Prior to the criminal investigation, Nadimpalli agreed to civil liability and signed over his house to help pay off losses he caused. Then, upon learning of the criminal charges against him, Nadimpalli quickly agreed to voluntarily return the United States, obviating the need for extradition proceedings that could have taken years and cost considerable government resources. Nadimpalli also quickly agreed to plead guilty and take full responsibility for his conduct. His true acceptance of responsibility has been the mirror image of other defendants in this district who engaged in similar fraud schemes who have only agreed to plead guilty after substantial pretrial litigation, the setting of multiple trial dates, and who refused to take full responsibility for their conduct even at sentencing.

A prison sentence in this case, however, is necessary to account for the seriousness of the offense and promote general deterrence. The magnitude of Nadimpalli's lies was substantial and he was able to obtain substantial sums of money—over $40 million—from investors through those lies. While these investors had approximately 33% of their funds returned to them, they still suffered significant economic harm and/or reputational harm. In their victim impact statements, three of the venture capital firm investors reported that they suffered reputational harm as a result of their association with SKAEL

and Nadimpalli. PSR ¶¶ 16, 18, & 25. And individual investors reported investing their personal savings in SKAEL and the financial and emotional distress caused by having their trust broken. PSR ¶¶ 17, 20, 21, 23, 24, 29.

Further, although Nadimpalli states that he engaged in the fraud scheme so his employees could keep their jobs and their health insurance, Nadimpalli also took investments from some of these employees and recruited other employees, knowing that SKAEL was propped up on lies. Nadimpalli also created fake bank statements and data to support his scheme, tricking not only SKAEL's investors but also SKAEL's finance employees and putting his finance employees directly in the middle of serious SEC and DOJ parallel investigations. Nadimpalli also provided altered bank statements to SKAEL's internal investigation, and the full extent of his fraud was only discovered when they obtained the statements directly from the bank. Therefore, while Nadimpalli deserves credit for the extent to which he has accepted responsibility now, the Court's sentence must also take into account the fact that Nadimpalli committed a serious offense that caused significant harm to investors and employees.

An 18-month sentence is also necessary to deter other entrepreneurs from engaging in fake-it-til-you-make-it schemes in Silicon Valley. Nadimpalli's criminal conduct had the effect of creating an unlevel and corrupt playing field in Silicon Valley. Honest founders competing for venture funding may have missed out on funding they would have otherwise received, or received funding on worse terms had they not been competing with Nadimpalli's inflated financials. If conduct like the defendant's is not punished and deterred, other founders raising money will have all the incentives to fraudulently inflate financial information to raise funds. The upside of that conduct is clear, millions of dollars in funding to grow a business much smaller than is touted. When the fraud scheme is discovered, the downside must be enough to deter others from making the same choice, at the expense of the honest participants in Silicon Valley's innovation economy.

For these reasons, the government recommends a sentence of 18 months in order to reasonably but justly punish Nadimpalli for the crimes he committed and deter him and others from these types of crimes. The government also concurs in the PSR recommendation of three years of supervised release.

### C. Restitution

Restitution is mandatory in this case under 18 U.S.C. § 3663A. According to that provision, the

1  Court "shall order, in addition to … any other penalty authorized by law, that the defendant make

2  restitution to the victim of the offense." 18 U.S.C. § 3663A(a)(1). The term victim includes any person

3  or entity

> directly and proximately harmed as a result of the commission of an offense for which restitution may be ordered including, in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern.

18 U.S.C. § 3663A(a)(2).

Nadimpalli agreed in his plea agreement to pay restitution to his victims, agreeing to "pay full restitution for all losses caused by all the schemes or offenses with which I was charged in this case." Dkt. No. 8 ¶ 9.

As of the date of this filing, the government has received requests for restitution in the following amounts, for the victims identified below. In order to protect the identity of the victims and protect the privacy of their financial information, the government will submit under seal additional information about each victim, any request for restitution or Victim Impact Statement submitted by the victim, and documents supporting the restitution amount for that victim. All under seal materials and submissions have been or will be provided to counsel for the defendant. In the event that the government receives additional claims for restitution, or additional information about these claims, the government will also promptly provide it the Court.

The government asks that restitution be ordered as set forth in the following chart:[3]

| Victim | Amount Invested | Amount Received Back from SKAEL | Expenses Participating in Investigation | Restitution Due | Under Seal Attachment Reference |
|---|---|---|---|---|---|
| Investor 1 | $4,999,991.11 | $1,670,312.15[4] | $9,060.50 | $3,338,739.46 | Attachment A |
| Investor 2 | $7,999,990.78 | $2,672,501.65 | | $5,327,489.13 | Attachment B |

---

[3] SKAEL submitted a victim impact statement relating to Nadimpalli's personal use of company funds, which claims a loss of $721,751.67. *See* Attachment N. The submission notes that SKAEL received $676,960.54 of proceeds from the sale of Nadimpalli's house. The government is not seeking a restitution award on behalf of SKAEL because it is unable to prove at this time that Nadimpalli personally used without authorization more than $676,960.54 in SKAEL funds.

[4] A spreadsheet obtained from SKAEL showing the amounts of payments made back to investors is attached as Attachment O.

US SENTENCING MEMORANDUM         8
CR 24-00021 CRB

| Victim | Amount Invested | Amount Received Back from SKAEL | Expenses Participating in Investigation | Restitution Due | Under Seal Attachment Reference |
|---|---|---|---|---|---|
| Investor 3 | $25,000 | $8,350.80 | | $16,649.20 | Attachment C |
| Investor 4 | $50,000 | $16,703.10 | | $0[5] | Attachment D |
| Investor 5 | $100,000 | $33,404.71 | | $33,297.65[6] | Attachment E |
| Investor 6 | $100,000 | $33,404.71 | | $33,297.65[7] | Attachment F |
| Investor 7 | $150,000 | $50,109.47 | | $0[8] | Attachment G |
| Investor 8 | $15,749,992.82 | $5,261,493.22 | | $10,488,499.60 | Attachment H |
| Investor 9 | $10,000 | $3,340.50 | | $6,659.50 | Attachment I |
| Investor 10 | $50,000 | $16,702.49 | | $33,297.51 | Attachment J |
| Investor 11 | $50,000 | $16,702.49 | | $33,297.51 | Attachment K |
| Investor 12 | $25,000 | $8,351.47 | | $0[9] | Attachment L |
| Investor 13 | $500,000 | $167,026.83 | | $332,973.17 | Attachment M |
| Total | | | | **$19,644,200.38** | |

### D. Fine and Forfeiture

The government agrees with the Probation Office recommendation that the fine be waived. Given his anticipated incarceration, and the expected liability for a restitution order, the government agrees that Nadimpalli does not have an ability to pay a significant fine. There is no pending forfeiture associated with this case, and no forfeiture is sought in connection with this sentencing.

---

[5] The government is not supporting a restitution award for Investor 4 because Investor 4's investment was made in 2018, prior to charged fraud scheme beginning in 2020.

[6] The government is only supporting half of Investor 5's restitution claim because half of Investor 5's investment was made in 2018, prior to the charged fraud scheme beginning in 2020.

[7] The government is only supporting half of Investor 6's restitution claim because half of Investor 6's investment was made in 2018, prior to the charged fraud scheme beginning in 2020.

[8] The government is not supporting a restitution award for Investor 7 because Investor 7's investments were made in 2017 and 2018, prior to the charged fraud scheme beginning in 2020.

[9] The government is not supporting a restitution award for Investor 12 because Investor 12's investment was made in 2018, prior to the charged fraud scheme beginning in 2020.

## V. CONCLUSION

For the foregoing reasons, the government recommends a sentence of 18 months in prison, along with a term of supervised release with the conditions set forth in the PSR.

DATED: October 31, 2025

Respectfully submitted,

CRAIG H. MISSAKIAN
United States Attorney

_____/s/_____
NOAH STERN
Assistant United States Attorney

# Attachments Filed Under Seal