Jonathan M. Baum (SBN 303469)
jbaum@hwglaw.com
Joy Holden (admitted *pro hac vice*)
jholden@hwglaw.com
**HWG LLP**
1919 M Street NW, 8th Floor
Washington, DC 20036
Telephone: (202) 730-1300 / Facsimile: (202) 730-1301

Attorneys for Defendant
BABA NADIMPALI

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA<br><br>Plaintiff,<br><br>vs.<br><br>BABA NADIMPALLI,<br><br>Defendant. | Case No. 3:24-cr-00021-CRB<br><br>**DEFENDANT'S SENTENCING MEMORANDUM**<br><br>Judge:  Hon. Charles Breyer |

DEFENDANT'S SENTENCING MEMORANDUM

As evidenced by the Government's 18-month sentence recommendation, this case differs in significant ways from the typical fraud case. While Mr. Nadimpalli misled investors about his company's revenues, his motivation was not personal financial gain, but rather to maintain employment and health insurance coverage for his dozens of employees during the height of the Covid pandemic. This case also lacks the displays of wealth typical of many fraud cases. Mr. Nadimpalli lived modestly, took no salary for several years, and sunk his life savings into SKAEL—all of which he lost.  Moreover, it was Mr. Nadimpalli himself who revealed the fraud to investors less than three months after his company closed its $30 million Series A fundraising round, allowing investors to recoup much of their investment.[1]

## I.  Statement of Facts

The story of SKAEL is a perfect storm—an overwhelmed founder not equipped to handle the financial complexity of a demanding startup, a hot technology (artificial intelligence) a few years before its prime, and a pandemic that put intense pressure on the business, to which Mr. Nadimpalli responded by making the easy choice—lying about the company's revenues and hoping he could "execute his way out of it"—rather than the harder choice of admitting failure and living with the consequences.

SKAEL was Mr. Nadimpalli's life's work, and he put everything he had into the company. In December 2016, Mr. Nadimpalli and his wife, who'd just welcomed their first child

---

[1] Critically, at the time when Mr. Nadimpalli first admitted making misrepresentations to investors in May 2022, SKAEL still had approximately $25 million of its $30 million Series A round in the bank. Ex. 4, SKAEL, Inc., V2 General Ledger (2022). The fact that less money was eventually returned to investors months later is primarily because, after learning about the fraud, investors determined the business still had promise and decided to explore whether they could create "SKAEL 2.0" to leverage the promising AI tools the company had developed and create a profitable business. Eventually, some investors lost patience with this approach and pushed the company to liquidate.

DEFENDANT'S SENTENCING MEMORANDUM          CASE NO. 3:24-CR-00021-CRB

and were already expecting their second, poured their entire savings—about $350,000—into the business. Mr. Nadimpalli went without a salary until November 2017, using his own savings and credit cards to pay for the company's office expenses, health insurance, and salaries for employees and contractors. Even after Nadimpalli started taking a salary from SKAEL in November 2017, he paid himself only around $86,000/year, well below market for the Bay Area software industry. See Ex. 5, Payroll Register Excel with Employer Charges (2017); Ex. 6, Payroll Register Excel with Employer Charges (2018). In September 2019, Mr. Nadimpalli's wife, Smitha, sold her wedding jewelry to cover the family's expenses.

While it is true that Mr. Nadimpalli started in 2018 to use company funds to pay part of his mortgage and car payments—about $4,700 for his mortgage and $571.64 for his car—those expenses were necessary to meet the family's requirements and were later disclosed, at least in part, to investors. *See* Ex. 7, Silicon Valley Bank Statement (Dec. 2021). In April 2022, investors were expressly told in a presentation on executive salaries that Mr. Nadimpalli received approximately "$5k/month of 'Fringe Benefits.'"[2] Ex. 8 at 6, SKAEL Compensation Workshop Presentation. Mr. Nadimpalli was not alone in receiving these "fringe benefits"—the presentation disclosed that other employees also received similar financial support from the company. Additionally, in his settlements with the company after its collapse, Mr. Nadimpalli has repaid these funds in full.

Misleading Investors

Although SKAEL had success in developing its "digital employees"—early AI natural language tools that allowed companies to automate repetitive tasks—the company never

---

[2] Mr. Nadimpalli fully repaid all the funds he received from the company, plus an additional $176,000, when he signed over his San Francisco home to the investors.

DEFENDANT'S SENTENCING MEMORANDUM          CASE NO. 3:24-CR-00021-CRB

generated the type of exponential growth that Silicon Valley venture capital firms expected. Additionally, because developing this new technology required significant manpower, SKAEL hired quickly, bringing on more than fifty full-time employees by the end of 2021. (SKAEL's investors also encouraged the company to hire quickly to increase the company's revenues and justify a higher valuation.)

Mr. Nadimpalli felt intense pressure to keep SKAEL running, in part so these employees would not lose employment or health insurance.[3] *See, e.g.*, Ex. 9, Email from Baba Nadimpalli re Healthcare Benefits (June 27, 2019). During the critical time before the Company's Series A fund closed in February 2022, Mr. Nadimpalli constantly feared the company was on the verge of running out of money. Mr. Nadimpalli's sense of personal responsibility was heightened because a number of employees and their family members had serious health problems. One of Mr. Nadimpalli's closest colleagues at SKAEL, Head of Products FK, faced a crisis when his wife was diagnosed with a brain tumor and needed to be flown from Pakistan to San Francisco to receive treatment.[4] *See* Ex. 10, Slack message from FK to Baba Nadimpalli (Dec. 22, 2017). Two years later, her treatment was ongoing, and Nadimpalli feared the company's failure would cut off her access to care.[5] *See* Ex. 11, Slack message from FK to Baba Nadimpalli (Feb. 22, 2019). It was during this time of intense pressure to keep SKAEL operating that Mr.

---

[3] For instance, in June 2019, SKAEL had to drop health insurance coverage for employees and encourage staff to purchase their own healthcare coverage on the ACA marketplace. Ex. 9. The company was able to begin providing health insurance for employees several months later.

[4] "Update from the neurologist in Pak: He confirmed that it's a tumor but it's benign. She will have to get operated upon to get it out. He said that given what he has seen in the images, the operation doesn't need to be done ASAP, but he would like her to be in SF sooner rather than later." Ex. 10.

[5] "UCSF has to [sic] mandated to do 6 monthly MRIs for 2yrs since radiation. . . so we're coming up to that milestone." Nadimpalli responds: "praying everything turns up fine and it's something simple." Ex. 11.

DEFENDANT'S SENTENCING MEMORANDUM        CASE NO. 3:24-CR-00021-CRB

Nadimpalli's misstatements to investors began. Mr. Nadimpalli began by simply passing on figures he received from the sales team without confirming whether the contracts were finalized or whether the funds had actually been received. He later escalated to knowingly transmitting false revenue numbers.

Disclosure and Investigation

The situation came to a head on May 20, 2022, when Mr. Nadimpalli was preparing a presentation to the Board of Directors detailing SKAEL's Q1 2022 performance. The company's new finance director, PL, had gone through the company's financials and told Mr. Nadimpalli there were serious irregularities. Rather than trying to keep these findings quiet or sweep them under the rug, Mr. Nadimpalli reached out to the company's investors. He spoke first with Dell Technologies Capital, admitting that the company's actual revenue numbers were very different from what had been previously disclosed. Dell cut the call short and decided to initiate a formal investigation. *See* Ex. 12, Email from RM[6] to JS re SKAEL Board Update (May 20, 2022) (Dell writes to other venture capital firm on May 20, 2022, saying, "**we heard some pretty concerning updates from Baba** when going through the board slides in advance of the board meeting. Can we get on a call asap" (emphasis added)). On that call and calls with other investors over the following days, Mr. Nadimpalli apologized for sending false information and offered to close the company and return all funds.

Following Baba's disclosure, the venture capital investors moved quickly to confirm the scope of the misrepresentations. Days later, Goodwin Proctor was hired to conduct a full investigation, which was to be completed by June 27, 2022. *See* Ex. 13, Email from TJ to Baba

---

[6] The prosecution has asked the defense to anonymize the names of the employees and officers of institutional venture capital funds. To comply, this brief uses initials, and the names in the exhibits are redacted, except for initials.

DEFENDANT'S SENTENCING MEMORANDUM          CASE NO. 3:24-CR-00021-CRB

Nadimpalli (June 15, 2022). On July 18, 2022, Goodwin Proctor recommended hiring a liquidator, Richard Couch at Diablo Management Group, to sell the company's assets, and the next day, Mr. Couch sent an email to SKAEL shareholders informing them that the Board had voted to close the company and begin the process of returning money to investors. *See* Ex. 14, Email from CM to JS, JA, and Baba Nadimpalli (July 18, 2022).

At that point in late July 2022, SKAEL still had more than $22.3 million in its bank account, according to the restated accounting prepared by Mr. Couch. *See* Ex. 4, SKAEL, Inc., V2 General Ledger (2022). However, despite the opportunity at that point to recover most of the money they had invested, many of the investors opposed the idea of liquidating a company they believed had real economic value. On August 1, 2022, an investor from Vela Partners wrote, "I heard the news, and we are all shocked here that the company decided to liquidate while having a bunch of cash, real business, IP and committed key executives and employees. We don't understand why a liquidator is assigned." Ex. 15, Email from YI. Another investor, TJ at Dell Technologies Capital, wrote on August 22, 2022, expressing frustration that the liquidator "isn't directing the resources available to him around a strategy that maximizes the existing asset value, unlocks existing revenues, and speaks to the potential of the existing IP—either for preparing an assets sale or growing the existing business to find a buyer." Ex. 16, Email from TJ.

Exploring the Possibility of "Skael 2.0"

After looking more closely at the company, the liquidator, Mr. Couch, became an advocate for "Skael 2.0," a reboot of the business that would take advantage of its promising technology and existing customer base. As part of this effort, Mr. Couch kept sixteen employees on SKAEL's payroll into October 2022 and developed a plan to spend $4 million over eighteen months to build what he called "Skael 2.0." Ex. 17, Email from TJ (Sept. 25, 2022). Into

DEFENDANT'S SENTENCING MEMORANDUM          CASE NO. 3:24-CR-00021-CRB

November 2022, Mr. Couch delayed preparing for a sale of the company's assets, believing that two SKAEL employees, Chief Technology Officer VE and Chief Revenue Officer BC, could transform the company into a viable enterprise. Ex. 18, Email from TJ.

Together with Mr. Couch, Ebrahimian and Cahak developed a detailed 23-page PowerPoint presentation in August 2022 to pitch the launch of SKAEL 2.0. Ex. 19, SKAEL 2.0, Hyper-automation for Revenue Teams Presentation (Aug. 2022). This vision for SKAEL 2.0 entailed spending $2.2 million over twelve months and preparing to launch SKAEL 2.0 in Q1 2023. The presentation makes clear that some investors saw value not only in the company's IP, but also in SKAEL's existing relationships and customer base, and believed they could "raise $3.5M equity financing to achieve critical milestones." *Id.* at 4.

Eventually, however, the investors from Dell prevailed and blocked the SKAEL 2.0 effort. The lead investor at Dell wrote to the other investors: "Dell has no interest in a Skael 2.0 plan even if there was a phenomenal economic possibility. Trust has been broken, not just with Baba, but also with the company and the other investors which should have caught this issue long ago. There is no scenario where Dell wants to be on a cap table ongoing with those other investors." Ex. 20, Email from TJ (Sept. 26, 2022). Rather than seeking to save SKAEL, Dell pushed for a quick exit and pushed the liquidator to exert maximum pressure on Mr. Nadimpalli. This spelled the end of any hope for SKAEL 2.0.

<u>Civil Settlement and Moving Back to Australia</u>

In their persistent effort to recover funds, the venture capital firms pushed Mr. Nadimpalli as hard as they could to disgorge every last asset. One of the investors from Dell praised the liquidator for keeping the pressure on: "Richard has done an excellent job of holding Baba accountable. Baba's house will close and return $683K of funds to the company in the next

week." Ex. 21, Email from TJ. On November 17, 2022, the sale of Nr. Nadimpalli's house finally closed, and after paying the remaining mortgage balance and fees, the equity of $676,937.84 was transferred to the investors, wiping out all the equity Mr. Nadimpalli and his wife had built, including all their savings from their previous eight years working in the United States before the launch of SKAEL.[7] Ex. 22, Estimated Seller's Statement. Mr. Nadimpalli was not living a life of luxury. *See* Ex. 23, Pictures of his family home and his Subaru that he shared with his wife until moving back to Australia.

Between August and October 2022, Mr. Nadimpalli met with the liquidator at least 18 times. Mr. Nadimpalli provided a complete accounting of his assets and agreed to turn them over to the investors, but Mr. Couch kept up the pressure. On August 19, Couch wrote to Nadimpalli: "BABA, Where are your responses to my questions of yesterday? I asked you to work on a 24 hour turn around and we don't seem to be keeping that pace. SEND INFORMATION TO ME TODAY!" Ex. 24, Email from Richard Couch to Baba Nadimpalli. The next day, Mr. Couch wrote: "Baba, Your failure to respond as promised suggests that we have reverted to an unproductive communication and delivery process which makes the current situation far more serious, and increases the consequences for inaction and uncooperativeness. Respond to my earlier emails today." Ex. 25, Email from Richard Couch to Baba Nadimpalli. As it turns out, Mr. Nadimpalli hadn't been able to respond because the company had cut off Mr. Nadimpalli's access to his SKAEL email address, and when Mr. Nadimpalli finally received the messages, he responded promptly. *See* Ex. 26, Email from Baba Nadimpalli to Richard Couch (Aug. 23, 2022).

---

[7] This amount is significantly higher than the $500,000 Mr. Nadimpalli is alleged to have taken from the company to pay personal expenses. *See* Ex. 22.

DEFENDANT'S SENTENCING MEMORANDUM        CASE NO. 3:24-CR-00021-CRB

The investors also aggressively pursued civil remedies against Mr. Nadimpalli. On May 2, 2023, Mr. Nadimpalli signed a settlement agreement agreeing to forfeit all of his stock in SKAEL (5,484,864 shares) and to pay $823,039.46, including 20 percent of his income post-SKAEL. *See* Ex. 27, Settlement and Release Agreement. For several months, Baba had a job and made payments according to the settlement, but he has not been employed since October 30, 2023, and has not been able to make further payments since then.

The investors also pressured Mr. Nadimpalli to sign several promissory notes. Unsatisfied with the proceeds from the sale of Mr. Nadimpalli's home, the liquidator demanded that Mr. Nadimpalli sign $1.5 million promissory note, superseding the original $1 million promissory note, because the investors expected his San Francisco home to sell for more money. Ex. 28, Demand Letter (Aug. 15, 2022). Couch told Nadimpalli he would be subject to criminal sanctions if Baba refused to sign. *See id.* Even though Baba eventually signed, the investors nonetheless went ahead and pursued a criminal prosecution. The investors exchanged emails confirming that they viewed using pressure by the DOJ as part of their efforts to extract money from Mr. Nadimpalli. *See* Ex. 29, Email from TJ to other investors (Dec. 9, 2022) ("our corporate intends to engage with the DOJ + SEC as an additional data point of influence."). The liquidator, Mr. Couch, worked with outside counsel to prepare a "package" about Mr. Nadimpalli to send to DOJ, and strategized with venture capital investors to strengthen the criminal case against Mr. Nadimpalli. *See* Ex. 30, Email from TJ to other investors (Feb. 7, 2023) ("they would prefer not to submit the package to DOJ until after Baba has signed over the final separation & civil agreements with the company. It strengthens the legal case against him if he settles.").

Meanwhile, unaware that the venture capital investors were campaigning for DOJ to

DEFENDANT'S SENTENCING MEMORANDUM          CASE NO. 3:24-CR-00021-CRB

bring a criminal case against him, Baba began trying to rebuild his life. Broke, Mr. Nadimpalli and his family moved back to Australia in September 2022, where they rent a modest house in Melbourne, close to his extended family. Baba's wife, Smitha, is now the family's breadwinner. She works at the local water utility as a chemical engineer specializing in water treatment. Baba has not worked since October 30, 2023, and is primarily responsible for taking care of their two children, Ayan (11) and Leela (8).

When the indictment in this case was unsealed in September 2024, Mr. Nadimpalli was firmly settled back in Australia and could have contested extradition or fought the charges. Instead, he voluntarily flew himself to San Francisco to plead guilty and accept responsibility for his actions. Now, he is voluntarily returning for sentencing.

## II. Personal Background

Baba Nadimpalli was born in Bangkok in 1983, where his father was working as a secretary to India's Ambassador to Thailand. The family later returned to New Delhi before relocating to Melbourne when Mr. Nadimpalli was 7 years old. Because Baba's father's Indian degree was not fully recognized in Australia, Baba's father enrolled in night classes to meet local credentialing requirements. His father took a job as an accountant in Melbourne to provide greater stability and opportunity for the family.

Immigrating to Australia in 1990 opened new possibilities for the Nadimpalli family, but they also experienced racism and discrimination. Australia had only ended its "white Australia" policy, which prohibited most Asian immigrants, fifteen years earlier in 1975, and there was still hostility toward Asians. Growing up in Melbourne's working-class suburbs, Baba faced frequent bullying. His parents worked hard to provide for their two children. His father took accounting roles for retail and hospital systems, and his mother contributed however she could—stitching

DEFENDANT'S SENTENCING MEMORANDUM        CASE NO. 3:24-CR-00021-CRB

clothes, doing small art and craft work, and taking shifts at local factories packaging items such as jackets and other goods.

Seeking structure and discipline for their eldest child, Baba's parents sent him to a boarding school in India from sixth through ninth grade. Living a continent away from his family had a major impact on Baba. While in boarding school, Baba saw his parents only for a few weeks a year during summer breaks.

Baba returned to Melbourne in his teenage years to complete his secondary education. His parents chose a suburban area they believed would offer structure, but the community was poor and populated largely by newly arrived refugees from conflict zones in Iraq and elsewhere. Baba's early high school years were marked by exposure to a rough environment of fighting and bullying. Nonetheless, his academic promise and persistence eventually earned him a place at Melbourne High School—widely regarded as the best public school in the state of Victoria.

After graduating, Baba was accepted to the Royal Melbourne Institute of Technology (RMIT), a significant accomplishment for a student from his background. However, while pursuing his studies there, his father lost his job, and the family could no longer afford his tuition. Baba was forced to withdraw after a year and never graduated from college.

From 2003 to 2008, Mr. Nadimpalli worked as a junior information technology technician. Because advanced technology certification programs in Australia were expensive, Baba traveled to India for nine months to complete equivalent coursework in computer networking and information systems, which allowed him to return to Australia qualified for higher-level positions in technology and laid the groundwork for his later work in artificial intelligence.

Mr. Nadimpalli immigrated to the United States in 2008 after his wife began pursuing her

DEFENDANT'S SENTENCING MEMORANDUM        CASE NO. 3:24-CR-00021-CRB

master's degree in Texas. They ultimately decided to build their life in California, drawn to San Francisco's diversity and creative energy. Before founding SKAEL, Mr. Nadimpalli worked as a solutions architect for Dimension Data. For three years, Baba designed large-scale technical systems and data-center solutions for major clients including Apple, Google, Oracle, and the Red Cross. During this time, Baba began thinking about ways to automate the repetitive, manual work he saw burdening technical teams—ideas that would later inspire his vision for SKAEL.

**III. Sentencing Argument**

For the past three years, Mr. Nadimpalli has been firmly settled in Melbourne, Australia, 7,500 miles from San Francisco. He has no intention to ever do business in the United States again, and, as a result of this case and the parallel SEC matter, *SEC v. Nadimpalli*, Case No. 3:24-cv-06683-CRB, which is stayed pending the resolution of this criminal case, he will likely never be able to serve as an officer or director of a US company.

Mr. Nadimpalli's reputation is thoroughly destroyed. An Internet search of his name yields high profile press coverage of this case in the Wall Street Journal, San Francisco Chronicle and other outlets. *See, e.g.*, David Smagalla, *Skael Co-Founder Faces U.S. Fraud Charges*, WALL ST. J., Sept. 24, 2024; Maliya Ellis, *Former S.F. tech CEO allegedly raised millions while falsifying company's revenue*, S.F. CHRONICLE, Sept. 24, 2024. Mr. Nadimpalli has not worked in the technology industry since 2023. Additionally, the trust he destroyed with the investors who once supported him means his chances of being able to attract investors to a future startup are exceedingly slim.

For the past three years, Mr. Nadimpalli's day-to-day life has consisted of being the primary caretaker of his two children, ages 8 and 11.

Removing him from his family at this point to incarcerate him in the United States would

DEFENDANT'S SENTENCING MEMORANDUM        CASE NO. 3:24-CR-00021-CRB

serve no meaningful purpose and would cause serious harm to his family. Included below is the weekly schedule Mr. Nadimpalli created for the children's activities he is responsible for:

| | Monday | | Tuesday | | Wednesday | | Thursday | | Friday | | Saturday | | Sunday | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Ayan | Leela | Ayan | Leela | Ayan | Leela | Ayan | Leela | Ayan | Leela | Ayan | Leela | Ayan | Leela |
| | Breakfast | | Breakfast | | Breakfast | | Breakfast | | Breakfast | | Breakfast | | | |
| | Getting Ready | | Getting Ready | | Getting Ready | | Getting Ready | | Getting Ready | | Ayan Tennis Comp | Breakfast | Breakfast | |
| | School Drop-Off | | School Drop-Off | | School Drop-Off | | School Drop-Off | | School Drop-Off | | | Playtime | Cartoons | |
| | At School | | At School | | At School | | At School | | At School | | Swimming Lesson | Driving | Playtime | |
| | | | | | | | | | | | | Piano Lesson | | |
| | | | | | | | | | | | Lunch | Driving | Lunch | |
| | | | | | | | | | | | | Dance Lesson | | |
| | | | | | | | | | | | | Driving | | |
| | | | | | | | | | | | PS4 | Finish Lunch | | |
| | | | | | | | | | | | | Switch | | |
| | School-Pickup | | School-Pickup | | School-Pickup | | School-Pickup | | School-Pickup | | | | | |
| | Clean-up | Driving | Clean-up | Clean-up | Clean-up | Clean-up | Clean-up | Clean-up | Clean-up | Clean-up | Family Time - Board Games, Park, Cycling, Tennis. Kids choice. | | Family Time - Board Games, Park, Cycling, Tennis. | |
| | Flute Practice | Swimming | Driving | Practice + Homework + Tuition (Math & Reading) | Tennis Lesson | Cycling & Playground | Piano & Flute Practice. | Dance & Piano Practice. | Applied Science, Robotics, Computer Literacy | Creative Arts & Writing | | | | |
| | Driving | | Piano Lessons | | | Creative Arts & Writing | Homework- Applied math, persuasive writing. | Homework - Math & Science Reading | | | | | | |
| | Flute Lesson | Clean-Up | | Playtime | | | | | Playtime | | | | | |
| | Driving | Homework | Driving | | | Playtime | Playtime | | | | | | | |
| | Dinner | | Dinner | | Dinner | | Dinner | | Dinner | | Dinner | | Dinner | |
| | Story & Bedtime | | Story & Bedtime | | Story & Bedtime | | Story & Bedtime | | Story & Bedtime | | Story & Bedtime | | Story & Bedtime | |

For these reasons, and because Mr. Nadimpalli is a first-time offender with zero criminal history, the defense requests that the Court vary downward to impose a noncustodial sentence.

### a. The Court Should Vary Downwards to a Noncustodial Sentence Because The Guidelines Range Does Not Take Into Consideration the Unique Nature and Circumstances of the Offense

Although the defense has stipulated to the Guidelines calculation of loss amount and does not contest the Guidelines loss calculation, the Guidelines do not adequately account for Mr. Nadimpalli's actions in disclosing his misrepresentations to investors or the relatively lesser amount of the loss that was directly attributable to Baba's misstatements about SKAEL's finances.

Mr. Nadimpalli's conduct, while undoubtedly serious, involved misrepresentation of company financial information to investors during a period of significant business pressure. It was not a product of violence or malice. Baba promptly cooperated with investigators, entered a guilty plea, and has made significant restitution and civil payments, including more than $675,000 from the sale of his home. Accordingly, the Court should find that a variance to a non-custodial sentence is appropriate. Such a sentence would be fully consistent with the Sentencing Commission's stated intent—to ensure that low-risk, first-time, non-violent offenders are sentenced in proportion to their actual culpability and likelihood of reoffending.

Mr. Nadimpalli's actions in disclosing his own misrepresentations makes this an unusual case. SKAEL closed its Series A funding round in February 2022. Only three months later, in May 2022, Mr. Nadimpalli informed investors that the data he provided was incorrect. *See* Ex. 12. At that time, SKAEL had approximately $25 million in the bank. Ex. 4. By acting to inform investors of financial irregularities shortly after the close of SKAEL's Series A funding round, Mr. Nadimpalli headed off what could have been a much more significant loss. The decision by SKAEL's sophisticated venture capital investors to continue operating the company to see if a different management team could effect a turnaround was reasonable, but its failure should not be treated as a result of Mr. Nadimpalli's original misstatements.

DEFENDANT'S SENTENCING MEMORANDUM          CASE NO. 3:24-CR-00021-CRB

Additionally, while Mr. Nadimpalli's misstatements to investors clearly drove some investment decisions, it is not clear that all investor decisions were a result of misrepresentations by Mr. Nadimpalli. For instance, on November 23, 2019, the head of Bonfire Ventures wrote to Baba delivering a term sheet for a $3 million series Seed financial round. Ex. 31, Email from JA to Baba Nadimpalli. The plea agreement details misstatements by Mr. Nadimpalli "[s]tarting no later than January 2020," so it is not clear that this investment was affected. Additionally, the Court understands that venture capital investors frequently bet on several companies, understanding most will fail, in the hopes that one will succeed wildly. In this context, it is not clear that Mr. Nadimpalli's misrepresentation about revenues, rather than the state of SKAEL's technology or some other factor, was responsible for every investment decision that was made.

### b. The Nature and Circumstances of the Offense and the History and Characteristics of the Defendant Do Not Warrant Incarceration

As explained above this case differs from the typical fraud case in many ways. Mr. Nadimpalli has already made substantial efforts to make investors whole, including signing over his house and draining his life savings. Unlike other tech executives who enriched themselves and lived lives of luxury, Mr. Nadimpalli lived modestly and poured his own savings into the business—all of which he lost. While Mr. Nadimpalli made terrible choices, he has already paid substantially—with his life savings, his reputation, and his future economic prospects, all of which are destroyed.

Mr. Nadimpalli is a different person today than he was when he was running SKAEL. Then, he was working 18-hour days to try to save a struggling startup. Today he lives a quiet life in Australia, cooking for his family, driving his 8- and 11-year-old children to flute and piano lessons, and helping his kids with their homework. His son, Ayan (11), was recently admitted to Brentwood Secondary College, a highly selective high school in Melbourne, and was

one of fifty students selected for the gifted program. His daughter Leela (8) is a creative child who loves to swim, draw, and play tennis with her older brother and dad.

Now that Mr. Nadimpalli has destroyed his career, the family relies on his wife's income. As his wife, Smitha, explained:

> He is the primary care giver for the kids and drops and picks them from school and takes them to all their extracurriculars along with planning their free time with activities and outings. His dedication to spending every hour with them after school helping them with everything from homework to pondering over behaviours and emotions has helped them excel at school, music and sports. The kids are very close to him and lean on him for guidance and also for fun. He is very close to and always in touch with his brother and parents, ensuring they are doing well and we meet up often to spend time. Ex. 1, Statement of Smitha Nadimpalli.

Mr. Nadimpalli's obligations to his family—and the support they in turn provide him—weighs in favor of imposing a non-custodial sentence that will allow him to continue to support them. *See United States v. Autery*, 555 F.3d 864, 874–75 (9th Cir. 2009) (affirming downward variance in part because defendant had continuing support of his family).

### c. Deterrence has been Achieved and There is No Need to Protect the Public from Mr. Nadimpalli

There is no reason to believe that incarceration of Mr. Nadimpalli will achieve a meaningful deterrent effect. As to specific deterrence, Mr. Nadimpalli's career is in ruins, he has lost his home and his life savings, and his reputation is destroyed. He is already deterred. It is also unclear how requiring Mr. Nadimpalli to travel from Australia to the United States to serve a term of imprisonment would promote general deterrence. To prospective technology founders, Mr. Nadimpalli's public disgrace, total insolvency, and prohibition from doing business in the United States is probably a fate they fear at least as much as incarceration.

There is also no meaningful reason why incarcerating Mr. Nadimpalli would protect the public. *See* 18 U.S.C. § 3553(a)(2)(C)(A) (Defendant's potential deportation also may prove

relevant to whether a sentence will adequately "protect the public from further crimes of the defendant.").

He already lives in Australia and has no ability or intent to the return to the United States. *See United States v. Morales-Uribe*, 470 F.3d 1282, 1287 (8th Cir. 2006) ("[T]he need to protect the public from a defendant may be reduced in a case where, upon immediate release from incarceration, the Government will deport the defendant.").

### d. Rehabilitation is More Likely if Mr. Nadimpalli is Permitted to Remain in Australia

Mr. Nadimpalli has spent the last three years attempting to rebuild his life, reconnect with his family, and be a source of good in the world. As detailed in the PSR, he has sought therapy, and it has helped him. PSR, p. 13.

> As such, Baba has been to therapy to enable him to be present for the family. Therapy helped immensely in putting him in a better mental space and that in turn also helped me be strong for him and the family so we can get through this phase. *See* Ex. 1 at 2.

### e. The § 3553(a) Factors Strongly Favor a Non-Custodial Sentence

The primary goals of sentencing — deterrence, punishment, and rehabilitation — can all be achieved through probation with conditions of restitution, home confinement, and financial supervision. The Supreme Court has repeatedly affirmed that incarceration is not the sole means of promoting respect for the law. *See Gall v. United States*, 552 U.S. 38, 54 (2007) (recognizing that a probationary sentence "is not leniency" but a "substantial restriction of freedom" that satisfies the purposes of § 3553(a)); *Pepper*, 562 U.S. at 491 (sentencing courts must tailor punishment to each defendant's history and characteristics). Mr. Nadimpalli has already suffered severe professional, financial, and reputational consequences. He lost his company, surrendered his home, and repaid investors through voluntary asset liquidation. He has been fully compliant

with pretrial supervision. These circumstances provide strong evidence that further incarceration would serve no deterrent purpose.

### f. Restitution

Mr. Nadimpalli has agreed to pay full restitution as determined by the Court. However, the Court should set the amount after hearing and credit all monies already returned. See *Lagos v. United States*, 584 U.S. 353 (2018) (restitution limited to direct losses). Interest should be waived under 18 U.S.C. § 3612(f)(3).

### I. Conclusion

Mr. Nadimpalli has accepted full responsibility for his conduct. His offense—fraudulent misrepresentations to investors—was serious, but it was non-violent, confined to his professional life, and entirely inconsistent with his otherwise law-abiding history. He has already paid a heavy personal and financial price, including the sale of his family home and substantial civil payments. He has demonstrated remorse and a genuine commitment to rebuilding his life. Given his lack of any criminal record, his residency in Australia, and his low risk of reoffending, further incarceration is unnecessary to achieve the goals of sentencing.

For these reasons, Mr. Nadimpalli respectfully asks the Court to impose a non-custodial sentence—reflecting both the seriousness of the offense and Mr. Nadimpalli's acceptance of responsibility, restitution efforts, and rehabilitation.

DEFENDANT'S SENTENCING MEMORANDUM          CASE NO. 3:24-CR-00021-CRB

Dated:  October 31, 2025                          Respectfully submitted,


By:    /s/ Jonathan M. Baum
Jonathan M. Baum (SBN 303469)
jbaum@hwglaw.com
Joy L. Holden* (admitted *pro hac vice*)
jholden@hwglaw.com
HWG LLP
1919 M Street NW, 8th Floor
Washington, DC 20036
Telephone: (202) 730-1300
Facsimile: (202) 730-1301

*Attorneys for Defendant*
BABA NADIMPALLI

1

## CERTIFICATE OF SERVICE

2

I hereby certify that on October 31, 2025, I caused the foregoing document to be served

3

by email upon counsel of record for all Parties listed in the service list below. I declare under

4

penalty of perjury that the foregoing information in this Certificate of Service is true and correct.

5

6

7

8

*/s/ Jonathan Baum*
Jonatham Baum

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**CERTIFICATE OF SERVICE**
**CASE NO. 3:24-CR-00021-CRB**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**SERVICE LIST**

**CASE NO. 3:24-CR-00021-CRB**